UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

JAMES ODIS WILLIAMS,            )
                                )
          Plaintiff,            )
                                )
     v.                         )   Case No. 4:11CV1666 FRB
                                )
CAROLYN W. COLVIN,[1] Acting    )
Commissioner of Social          )
Security,                       )
                                )
          Defendant.            )


**MEMORANDUM AND ORDER**

     This matter is before the Court on plaintiff James Odis
William's appeal of an adverse decision of the Social Security
Administration.   All matters are pending before the undersigned
United States Magistrate Judge, with consent of the parties,
pursuant to 28 U.S.C. § 636(c).

## I.   Background and Procedural History

     Plaintiff James Odis Williams applied for Disability
Insurance Benefits ("DIB") pursuant to Title II, and Supplemental
Security Income pursuant to Title XVI, of the Social Security Act,
42 U.S.C. § 401, et seq. (also "Act"), alleging that he became
disabled on August 1, 2007.  (Administrative Transcript ("Tr.") at
103-13).  Plaintiff's applications were denied, and he requested a

---

[1]Carolyn W. Colvin became the Acting Commissioner of Social
Security on February 14, 2013.  Pursuant to Rule 25(d) of the
Federal Rules of Civil Procedure, Carolyn W. Colvin should
therefore be substituted for Michael J. Astrue as the defendant
in this case.  No further action needs to be taken to continue
this suit by reason of the last sentence of 42 U.S.C. § 405(g).

- 1 -

hearing before an administrative law judge ("ALJ"), which was held on May 11, 2010.   (Tr. 23-45).

On July 29, 1010, the ALJ issued an unfavorable decision. (Tr. 6-19).   On July 23, 2011, defendant agency's Appeals Council denied plaintiff's request for review, and the ALJ's decision thus stands as the Commissioner's final decision subject to review in this Court.   42 U.S.C. § 405(g).

The issues that plaintiff has submitted for judicial review in this case are that the ALJ failed to properly consider residual functional capacity, failed to properly consider the opinion of plaintiff's treating physician Umesh Inampudi, M.D., failed to consider medication side effects, and failed to obtain a medical expert to determine whether illegal drugs caused or contributed to plaintiff's heart disease and the degree of limitation caused thereby.

## II.   Evidence Before The ALJ

### A.   Plaintiff's Testimony

Plaintiff first responded to questions posed by the ALJ. Plaintiff testified that he had an eleventh grade education, was single, and had three children, ages 28, 29 and 30.  (Tr. 27).   He testified that he had lived with his adult nephew for the past five years.  (Tr. 28).   He received food stamps, but had no other source of income.  (Tr. 30).

Plaintiff testified that he worked as a meat clerk in different grocery stores from 1995 until 2007.   (Tr. 28). Plaintiff sometimes performed meat cutting duties, and was required

to lift up to 60 pounds.  (Id.)  Plaintiff last worked in 2007, and stated that he left his last job because he "kept getting ill" and was not "feeling right."  (Tr. 29).

Plaintiff then responded to questions from his attorney. Plaintiff testified that his blood pressure "gets out of control every once in a while," characterized by nosebleeds and pain behind his ears, and testified that this occurred "[p]robably about every day or every other day" and lasted until he took medicine.  (Tr. 29-30).  When asked why he sometimes did not take his blood pressure medication, plaintiff testified: "[s]ometimes I can't afford the medication.  I go – – sometimes they give it to me but the times when I miss it it's because they won't give me my medication because I can't afford it."  (Tr. 30).

Plaintiff testified that he had diabetes and had begun taking insulin "a couple months ago," and also took Glucophage.[2] (Tr. 31).  He testified that he had numbness and tingling in his feet and fingers and low energy, felt thirsty, needed glasses, and needed to use the bathroom frequently.  (Tr. 31-33).  During plaintiff's most recent visit to the clinic, he was told that his blood sugar was high but that medication should bring it down. (Tr. 31).  He was also following a diet recommended by a nutritionist.  (Id.)

Plaintiff testified that he did not sleep well at night

---

[2]Glucophage, or Metformin, is used alone or in combination with other medications, including insulin, to control Type 2 diabetes. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a696005.html

and snored, and that he suffered from shortness of breath when traveling stairs, walking or lifting, and carried a rescue inhaler with him at all times.  (Tr. 33-34).  Plaintiff testified that weather extremes caused breathing problems.  (Tr. 34).  He testified that he could walk for one block and stand and sit for 30 to 60 minutes, and that traveling stairs caused knee pain.  (Id.) He testified that he had intermittent pain in his elbows.  (Tr. 35).

Plaintiff testified that he sometimes helped his nephew clean the bathroom, but that his nephew did the heavy chores such as vacuuming and mopping, and did most of the grocery shopping. (Id.)  He testified that his sister sometimes picked him up and took him to see friends or relatives.  (Id.)  He did not attend church or engage in hobbies.  (Tr. 35-36).  He testified that he rose at seven o'clock, and went to bed at nine o'clock.  (Tr. 36). He ate breakfast "and then you know just fiddle around and take my medication and then watch TV, stuff like that."  (Id.)  He took a three-hour nap daily, stating that the medicine made him drowsy. (Id.)

During questioning from the ALJ, plaintiff testified that, in October of 2008 while helping a friend perform tree work, he fell from a ladder and broke his left foot and big toe.  (Tr. 37).  Plaintiff testified that, when he went to the consultative examination in March of 2009 he was limping as a result of having fallen off the ladder.  (Tr. 38).

Plaintiff testified that he could lift 30 to 40 pounds

- 4 -

but could not carry it, and that he could lift and carry ten pounds.  (Tr. 38-39).  He testified that he had swelling in his feet, and that, twice per week, he needed to lay down with his feet up.  (Tr. 39).

The ALJ then heard testimony from Vincent Stock, a vocational expert (also "VE") and licensed psychologist.  Mr. Stock classified plaintiff's past work and, after considering a hypothetical and various questions posed by the ALJ, testified regarding various jobs the hypothetical individual could perform. (Tr. 40-43).  Mr. Stock also responded to questions from plaintiff's counsel.  (Tr. 43-44).

B.  <u>Medical Evidence</u>

Plaintiff's list of prescription medications includes Metformin, Precose,[3] Loustatin,[4] and Metoprolol.[5]   (Tr. 176). Plaintiff also listed several medications under the nonprescription medications heading, medications that are typically used to treat various conditions including asthma, hypertension, and diabetes. See (<u>Id.</u>)

---

[3]Precose, or Acarbose, is used with diet alone or with diet and other medications to treat Type 2 diabetes. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a696015.html

[4]Lovastatin is used with diet, weight loss and exercise to reduce the risk of heart attack and stroke and reduce the chance for a need of heart surgery in people with heart disease or who are at risk for developing heart disease. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a688006.html

[5]Metoprolol is used to treat hypertension. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682864.html

On June 3, 2007, plaintiff presented to St. Louis University Hospital with complaints of pain, swelling and itching in his right leg. (Tr. 232-33). There is a notation that plaintiff suspected his symptoms were caused by a spider. (Tr. 234). He was discharged but instructed to return within the next eight to 12 hours for testing to rule out deep vein thrombosis. (Tr. 232, 241). He returned to St. Louis University Hospital on June 5, 2007. (Tr. 214-17). Upon examination, there was no pedal edema. (Tr. 218). Plaintiff reported having taken anti-hypertensive medication the preceding day. (Tr. 223). Vascular testing revealed no evidence for significant acute deep vein thrombosis in the right leg. (Tr. 227).

On November 17, 2007, plaintiff presented to St. Louis University Hospital with complaints of chest pain. (Tr. 249-52, 258). It is noted that plaintiff had a history of hypertension, cocaine abuse, cigarette smoking, and social use of alcohol. (Tr. 258-59). Plaintiff reported having used crack two days ago. (Tr. 258). Upon examination, plaintiff was in no respiratory distress, cardiovascular, psychiatric, and musculoskeletal examination were all within normal limits, and he had no pedal edema. (Tr. 253-54). Plaintiff's pain resolved in the emergency room. (Tr. 258). Chest x-ray revealed mild pulmonary vascular congestion, the appearance of an enlarged heart, and no pneumothorax. (Tr. 264). The impression was cardiomegaly and mild pulmonary vascular congestion. (Id.) Plaintiff was told to "stop all drug use!" (Tr. 245).

The record indicates that plaintiff was seen at Grace

Hill Neighborhood Health Center on February 28, 2008 for a check up. (Tr. 266). Examination was within normal limits, including no observation of edema. (Tr. 268).

On May 19, 2008, plaintiff was admitted to St. Joseph Health Center after presenting with complaints of chest pain of a three-minute duration after being arrested by police. (Tr. 275, 276, 278, 284, 286). Although plaintiff reported that he was compliant with his medications and diet, Scott Wasserstrom, M.D. noted that plaintiff had not taken his blood pressure medications that morning (Tr. 276), and Huilin Li, M.D. noted that plaintiff "had not been taking blood pressure medicines." (Tr. 278, 280). These records contain another observation that plaintiff had not taken his blood pressure medication. (Tr. 284). Dr. Wasserstrom noted that plaintiff had "poorly controlled hypertension and probable medicine noncompliance." (Tr. 274-75). Plaintiff's chest pain resolved, but his blood pressure remained elevated. (Tr. 278, 280, 285). He had no edema in his extremities, and was in no acute distress. (Tr. 285). Chest x-ray revealed cardiomegaly, and no active disease in the chest area. (Tr. 342). Cardiac catheterization yielded normal results, including normal left ventricular function. (Tr. 275, 296). When plaintiff was discharged, his blood pressure was under control, he had no fever, telemetry monitoring was negative, and lab testing, including a toxicology screen, was unremarkable. (Id.) Dr. Wasserstrom diagnosed "[h]ypertension with probable history of noncompliance," high cholesterol, and a history of emphysema. (Id.) Plaintiff was

advised to be active as tolerated, and to follow a special diet. (Id.)  It was noted that his condition on discharge was improved and stable.  (Tr. 275).

On July 28, 2008, plaintiff presented to St. Louis University Hospital with complaints related to his left ring finger after having closed it in a car door.  (Tr. 194-99).  He denied numbness or tingling.  (Tr. 208).  He reported his occupation as a handyman.  (Id.)  Review of systems was within normal limits.  (Tr. 209).  X-ray revealed soft tissue swelling but no fracture.  (Tr. 213).

On October 11, 2008, plaintiff presented to the emergency room at St. Louis University Hospital with complaints related to a fracture of his left great toe that occurred as a result of a fall from a ladder.  (Tr. 180-84).  He reported that he smoked cigarettes and was not interested in quitting.  (Tr. 184). Examination was within normal limits, with the exception of pedal edema.  (Tr. 186).  Plaintiff was given prescription pain medication, and was told to take his blood pressure medications as prescribed, and to follow up with his primary care provider.  (Tr. 183, 191-92).

On November 6, 2008, plaintiff presented to the emergency room of Barnes Jewish Hospital with complaints of chest pain, shortness of breath, and hypertensive urgency that began when he became upset after being pulled over by police.  (Tr. 430).  Mark S.W. Thoelke, M.D., noted that plaintiff's symptoms abated but then returned when he became upset after hearing another patient yell.

- 8 -

(Id.)  Plaintiff stated that he had experienced these symptoms in the past and took blood pressure medication for relief.  (Id.)

Plaintiff initially denied using cocaine but later, when confronted with a positive drug screen, admitted that he had used cocaine the previous day.  (Tr. 430-31).  Dr. Thoelke recommended that plaintiff undergo cardiac stress testing but that plaintiff refused, stating that he had to leave the hospital due to a family crisis.  (Tr. 431).  Dr. Thoelke advised plaintiff to stop using cocaine and start being compliant with his blood pressure medications.  (Id.)  Dr. Thoelke opined that plaintiff's hypertensive urgency was likely exacerbated by his cocaine use. (Id.)  He noted that plaintiff had not checked his blood sugar last night, and instructed plaintiff to take Glucophage and monitor his blood sugar.  (Id.)  Plaintiff was advised to stop smoking, but it is noted that he had no interest in attempting to do so.  (Tr. 431).  It is noted that plaintiff left against medical advice, and was instructed to follow up with his primary care doctor within one week.  (Tr. 432).

In January of 2009, plaintiff presented to the emergency room at St. Mary's Health Center with complaints of chest pain of three to five seconds in duration.  (Tr. 356).  Plaintiff reported that he had run out of hypertension medications while incarcerated. (Id.)  Plaintiff was "slightly short of breath" and denied nausea, vomiting, diarrhea, and angina-type symptoms in the last six months.  (Id.)  In the emergency room, plaintiff was found to have uncontrolled blood pressure, and was admitted for observation.

(Id.)  During his hospital stay, he did not have any more symptoms. (Tr. 356).   His blood pressure improved when he received medication.  (Id.)  EKG and cardiac enzyme testing were negative. (Id.)  He was observed to be comfortable, and in no acute distress. (Tr. 357).   There was no edema in his extremities.  (Id.)   The assessment was atypical chest pain of unknown origin, type-2 diabetes, obesity, uncontrolled hypertension, and high cholesterol. (Tr. 358).   He was discharged home with instructions to take Lisinopril[6] and Zocor,[7] to take Maalox when he had episodes of chest pain, and to have regular medical care, especially for diabetes control.  (Id.)

On March 20, 2009, plaintiff presented to Inna Lee Park, M.D., for an internal medicine examination.   (Tr. 389-95). Plaintiff reported hypertension of five to ten year duration, and stated that he was compliant with his medication.  (Tr. 389).  He stated that he suffered from headaches every three to four days that resolved when he took his medication.  (Id.)  He reported that he was hospitalized three to four times per year for hypertension. (Id.)   Plaintiff also reported diabetes of five to ten year duration.  (Id.)   Plaintiff stated that he had not had his eyes checked and did not know of any eye problems.   (Tr. 389).

---

[6]Lisinopril, is used to treat hypertension. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/ a692051.html

[7]Zocor (Simvastatin) is used together with diet, weight loss and exercise to reduce the amount of LDL cholesterol in the blood and increase the amount of HDL cholesterol in the blood. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a692030.html

Plaintiff reported numbness and tingling in his hands once per week. (<u>Id.</u>) Plaintiff also reported shortness of breath and asthma of a five to ten year duration. (<u>Id.</u>) He reported that he used inhalers and that they helped, but that he had bad days about once per week. (Tr. 390). He reported that he was short of breath on a daily basis, and could walk one block and climb one flight of stairs before becoming short of breath. (<u>Id.</u>) Plaintiff stated that standing and sitting were not a problem. (<u>Id.</u>) He reported that he tried to do sit-ups on a weekly basis. (<u>Id.</u>) Plaintiff reported that, one year ago, he stopped doing yard work because of his breathing difficulties. (Tr. 390). Plaintiff complained of impotence. (<u>Id.</u>)

Upon examination, Dr. Park found plaintiff to be comfortable with good knowledge of his medical issues and good hygiene. (<u>Id.</u>) He was obese, and had normal endurance for the examination. (<u>Id.</u>) He had cataracts, left greater than right. (Tr. 391). His lungs were clear, and cardiac examination was normal. (<u>Id.</u>) He had bilateral ankle edema, but no varicosities, brawny edema (change typical of chronic venous insufficiency), stasis changes, or ischemia. (<u>Id.</u>) Upon musculoskeletal examination, he was unable to make a fist with the right hand due to a machine injury on the palmar aspect of the right hand and inability to flex at the distal interphalangeal joints of the third and fourth fingers. (<u>Id.</u>) He had mildly decreased range of motion of the bilateral elbows, knees, wrists and left ankle, and there was crepitus in the bilateral knees. (Tr. 391). There was no

evidence of joint inflammation and no muscular atrophy. (Id.)
Plaintiff got on and off the examination table without difficulty.
(Id.) Dr. Park noted that plaintiff had a limp due to a left foot
fracture, and could not stand on his toes or heels but could squat
to 90 degrees and recover independently. (Id.) Motor strength was
normal with the exception of the loss of complete hand grip, and
fine motor control, reflexes, sensory and cerebellar functioning
were intact. (Tr. 391).

Dr. Park's clinical impression was hypertension that was
uncontrolled and symptomatic on a weekly basis; fair to poorly
controlled diabetes, asthma managed by inhalers, diffuse
arthralgias with slightly decreased range of motion, right hand
injury with decreased grip on the right, and left foot injury with
decreased range of motion on the left. (Tr. 392).

On April 21, 2009, plaintiff presented to the emergency
room of St. Louis University Hospital with complaints of shortness
of breath and chest pain with no precipitating factor. (Tr. 455).
(Id.) He denied smoking and drug use. (Tr. 456). Plaintiff's
Lisinopril dosage was increased, his asthma was characterized as
stable, and he was instructed to resume taking Glucophage at home.
(Tr. 462).

On August 6, 2009, plaintiff presented to Grace Hill
Clinic, although there are no complaints reported. (Tr. 502). On
September 9, 2009, plaintiff returned to Grace Hill Clinic with
hypertension, and was seen by Umesh Inampudi, M.D. (Tr. 499). It
is noted that plaintiff had hypertension. (Id.) Plaintiff

complained of eye pain but no vision loss, and review of all other systems was negative.  (Tr. 499-500).  Plaintiff was instructed to continue with his current medications.  (Tr. 500).

On November 18, 2009, plaintiff returned to Grace Hill Clinic and was seen by Dr. Inampudi, who noted that plaintiff had diabetes, hypertension, high cholesterol and asthma.  (Tr. 494). It is noted that plaintiff's asthma was allergic and seasonal. (Id.)  There was pitting edema on the bilateral legs.  (Tr. 495). There was no motor weakness or sensory loss, and balance and gait were intact.  (Id.)  He was diagnosed with unspecified essential hypertension that was "better" and it was noted that compliance was discussed, as was diet and weight loss.  (Tr. 496).  Plaintiff's diabetes was also described as "better."  (Id.)

On December 16, 2009, plaintiff returned to Grace Hill Clinic and was seen by Dr. Inampudi, who noted that plaintiff had diabetes and hypertension.  (Tr. 492).  Plaintiff complained of redness and swelling to his left eye.  (Id.)

On January 14, 2010, plaintiff presented to the emergency room of St. Louis University Hospital with complaints of shortness of breath while in court.  (Tr. 449).  He reported that he had been out of medication for three days.  (Id.)  He denied headache, swelling, chest pain, and shortness of breath while lying flat. (Id.)  Chest x-ray revealed a mildly enlarged heart.  (Tr. 453). Plaintiff was given medication, and his symptoms resolved.  (Tr. 450-51).  He was discharged home with instructions to follow up with his doctor in two to three days.  (Tr. 452).

- 13 -

On April 2, 2010, plaintiff was seen at Grace Hill Clinic by Dr. Inampudi, who noted that plaintiff had diabetes and hypertension.  (Tr. 486).  It is noted that plaintiff's risk factors were high salt intake, and sedentary lifestyle.  (Id.) Plaintiff reported that he was adhering to medication recommendations for diabetes and hypertension, but not adhering to diet recommendations for either condition.  (Id.)  It is noted that diabetes was managed with oral medication.  (Id.)  Plaintiff's active medications were listed as Ketoconazole (a topical cream to treat fungal infection), aspirin, and Viagra.[8]  (Tr. 486).  All other review of systems was negative.  (Id.)  Plaintiff was in no acute distress.  (Tr. 487).  His lungs were clear, his heart rate was regular, there was edema in his extremities, and there was no skeletal tenderness.  (Id.)  The assessment was "[d]iabetes mellitus without mention of complication," "[u]nspecified essential hypertension," and obstructive sleep apnea.  (Id.)  Plaintiff was advised to follow a strict diet and to begin using Lantus (injected insulin) to manage his diabetes.  (Id.)  Regarding hypertension, it is noted that it was "better" and that diet and weight loss had been discussed.  (Tr. 487).

On April 23, 2010, Dr. Inampudi completed a Physician's Assessment For Social Security Disability Claim form.  (Tr. 518). Dr. Inampudi listed plaintiff's diagnoses as hypertension, insulin-

---

[8]Viagra, or Sildenafil, is used to treat erectile dysfunction. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/ a699015.html

- 14 -

dependent diabetes, obstructive sleep apnea, high cholesterol, obesity, osteoarthritis, and asthma. (Id.) Dr. Inampudi wrote that, due to obesity, sleep apnea and asthma, plaintiff had difficulty with any activity due to shortness of breath. (Id.) Dr. Inampudi wrote that plaintiff's condition imposed environmental restrictions (such as working in extremes of temperature, humidity, and dust, pollutants, chemicals, fumes, smoke, etc., due to asthma. (Id.) Dr. Inampudi wrote that, due to plaintiff's "uncontrolled" diabetes, hypertension, and asthma, it was unlikely plaintiff could work as his endurance was low. (Tr. 518). Dr. Inampudi wrote that plaintiff could not do any physical work due to "uncontrolled" diabetes, hypertension, and asthma "at this time." (Id.)

In a Function Report dated February 18, 2007, plaintiff described his daily activities as taking medicine, making phone calls, and eating. (Tr. 152). He reported that he was able to make sandwiches every day. (Tr. 154). Regarding household chores, he reported that he could do very little at a time depending on how he felt, and also stated that he became out of breath. (Tr. 154-55). He wrote that he shopped in stores for food, but did not drive because he did not have a license (Tr. 155). He wrote that his nephew helped him with all aspects of managing money, but that his ability to handle money had not changed since the onset of his condition. (Tr. 155-56). Describing his hobbies and interests, plaintiff wrote that he watched television all day. (Tr. 156). He went to a friend's house once per week. (Id.) He wrote that various abilities were limited due to a lack of air and chest pain,

- 15 -

and reported that he could walk for 20 feet before needing to rest.
(Tr. 157).  He wrote that he could pay attention all day, follow
written and spoken instructions well, and get along with authority
figures.  (Tr. 157-58).

### III.    The ALJ's Decision

The ALJ determined that plaintiff met the insured status
requirements of the Act through March 31, 2012.  (Tr. 11).  The ALJ
determined that plaintiff had the severe impairments of cocaine-
induced   cardiomyopathy   and   chest   pain,   hypertension,
hyperlipidemia,   non-insulin   dependent   diabetes   mellitus,
obstructive sleep apnea, obesity, osteoarthritis and asthma, but
did not have an impairment or combination of impairments that met
or medically equaled a listed impairment.  (Tr. 11-12).  The ALJ
determined that plaintiff retained the residual functional capacity
(also "RFC") to perform light work as defined in 20 C.F.R. §§
404.1567(b) and 416.927(b), meaning that he could lift and/or carry
20 pounds occasionally and 10 pounds frequently; stand and/or walk
six hours in an eight hour workday, sit a total of six hours in an
eight hour workday, could not climb ladders, ropes or scaffolds,
could have no exposure to dangerous unprotected heights or hazards,
could have no prolonged exposure to extreme heat or cold, could
occasionally balance, stoop, kneel, crouch and crawl, and could
have no concentrated exposure to pulmonary irritants.  (Tr. 13).
The ALJ determined that plaintiff could not perform his past
relevant work.  (Tr. 17).  The ALJ wrote that he considered the
Medical-Vocational Guidelines and had also considered vocational

- 16 -

expert testimony regarding the extent to which plaintiff's additional limitations eroded the unskilled light occupational base. (Tr. 18). The ALJ concluded that plaintiff was capable of making a successful adjustment to other work that existed in significant numbers in the national economy, and that a finding of "not disabled" was therefore appropriate. (Id.)

## IV.   Discussion

To be eligible for Social Security Disability Insurance Benefits and Supplemental Security Income under the Social Security Act (also "Act"), plaintiff must prove that he is disabled. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001); Baker v. Secretary of Health & Human Servs., 955 F.2d 552, 555 (8th Cir. 1992). The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). An individual will be declared disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. See 20

- 17 -

C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 140-42
(1987).  The Commissioner begins by deciding whether the claimant
is engaged in substantial gainful activity.  If the claimant is
working, disability benefits are denied.  Next, the Commissioner
decides whether the claimant has a "severe" impairment or
combination of impairments, meaning that which significantly limits
his ability to do basic work activities.  If the claimant's
impairment(s) is not severe, then he is not disabled.  The
Commissioner then determines whether the claimant's impairment(s)
meet or equal any listed in 20 C.F.R., Subpart P, Appendix 1.  If
claimant's impairment(s) is equivalent to a listed impairment, he
is conclusively disabled.  At the fourth step, the Commissioner
establishes whether the claimant can perform his past relevant
work.  If so, the claimant is not disabled.  Finally, the
Commissioner evaluates various factors to determine whether the
claimant is capable of performing any other work in the economy.
If not, the claimant is declared disabled and becomes entitled to
disability benefits.

        The decision of the Commissioner must be affirmed if it
is supported by substantial evidence on the record as a whole.  42
U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971);
Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002).  Substantial
evidence is less than a preponderance but enough that a reasonable
person would find adequate to support the conclusion.  Johnson v.
Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001).  The "substantial
evidence test," however, is "more than a mere search of the record

- 18 -

for evidence supporting the Commissioner's findings." <u>Coleman v.</u>
<u>Astrue</u>, 498 F.3d 767, 770 (8th Cir. 2007) (internal quotation marks
and citation omitted).  The Court must also consider any evidence
which fairly detracts from the Commissioner's decision.  <u>Coleman</u>,
498 F.3d at 770; <u>Warburton v. Apfel</u>, 188 F.3d 1047, 1050 (8th Cir.
1999).

     If substantial evidence exists to support the
administrative decision, this Court must affirm that decision even
if the record also supports an opposite decision.  <u>Weikert v.</u>
<u>Sullivan</u>, 977 F.2d 1249, 1252 (8th Cir. 1992) (internal quotation
marks and citation omitted); <u>see also</u> <u>Jones ex rel. Morris v.</u>
<u>Barnhart</u>, 315 F.3d 974, 977 (8th Cir. 2003); <u>see</u> <u>also</u> <u>Pearsall</u>, 274
F.3d at 1217 (citing <u>Young v. Apfel</u>, 221 F.3d 1065, 1068 (8th Cir.
2000) (In the event that two inconsistent conclusions may be drawn
from the evidence, the Commissioner's findings may still be
supported by substantial evidence on the record as a whole).

   A.  <u>RFC Determination</u>

     As noted above, the ALJ determined that plaintiff
retained the residual functional capacity to perform light work
with some additional restrictions.  Plaintiff claims that the ALJ's
RFC determination is not supported by substantial evidence on the
record as a whole because the ALJ failed to properly consider
plaintiff's age when determining disability; failed to consider the
symptoms from neuropathy when considering RFC; and failed to
consider that plaintiff had been diagnosed with edema.

Residual functional capacity is defined as that which a person remains able to do despite his limitations.  20 C.F.R. §§ 404.1545, 416.945, Lauer v. Apfel, 245 F.3d 700, 703 (8th Cir. 2001).  The ALJ must assess a claimant's RFC based upon all relevant, credible evidence in the record, including medical records, the observations of treating physicians and others, and the claimant's own description of his symptoms and limitations.  20 C.F.R. § 404.1545; Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995); Goff, 421 F.3d at 793.

A claimant's RFC is a medical question, and there must be some medical evidence, along with other relevant, credible evidence in the record, to support the ALJ's RFC determination.  Id.; Hutsell v. Massanari, 259 F.3d 707, 711-12 (8th Cir. 2001); Lauer, 245 F.3d at 703-04; McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000).  Although an ALJ must determine the claimant's RFC based upon all relevant evidence, the ALJ is not required to produce evidence and affirmatively prove that a claimant can lift a certain weight or walk a certain distance.  Pearsall, 274 F.3d at 1217 (8th Cir. 2001); McKinney, 228 F.3d at 863.

While an that an ALJ's RFC determination must be supported by some medical evidence, "the burden of persuasion to prove disability and demonstrate RFC remains on the claimant." Vossen v. Astrue, 612 F.3d 1011, 1016 (8th Cir. 2010).  Plaintiff cannot meet this burden on his statements alone.  There must be medical signs and laboratory findings showing an impairment which could reasonably be expected to produce the symptoms alleged and

which, when considered with all of the other evidence, would lead
to the conclusion that the claimant is disabled.   20 C.F.R. §§
404.1529, 416.929.

    In support of his argument that the ALJ failed to
properly consider his age, plaintiff cites the following statement
from the ALJ's decision: "The undersigned cannot find the
claimant's allegations that he is incapable of **all work activity** to
be credible because of significant inconsistencies in the record as
a whole." (Docket No. 13 at 13) (emphasis in original).   Noting
that he was considered "closely approaching advanced age" as of his
alleged date of onset, plaintiff complains that the ALJ was
obligated to consider his age when considering his ability to
adjust to other work.  (Id.)  However, the ALJ's decision includes
multiple references to the fact that the ALJ considered plaintiff's
age when determining whether plaintiff was capable of making an
adjustment to other work.  (Tr. 18).  The ALJ acknowledged his duty
to consider plaintiff's age in making this determination, he noted
that he included plaintiff's age in the hypothetical question he
posed to the VE, and he wrote that he had considered plaintiff's
age, education, work experience and residual functional capacity in
reaching his conclusion that plaintiff was capable of adjusting to
other work.  (Id.)  The statement plaintiff cites in support of
this meritless argument was made in the context of analyzing
plaintiff's credibility, not in the context of determining whether
plaintiff could make an adjustment to other work.

    Plaintiff next contends that the ALJ erroneously failed

to consider the symptoms from neuropathy when considering RFC. Plaintiff cites evidence documenting his complaints of tingling in his hands and feet, and concludes that these symptoms are consistent with diabetic neuropathy. Plaintiff also argues that his erectile dysfunction is evidence that he has end-organ damage from diabetes. Plaintiff's arguments are merely speculative. Plaintiff was never diagnosed with diabetic neuropathy. The fact that he has symptoms which are also experienced by people with diabetic neuropathy does not demand the conclusion that plaintiff has diabetic neuropathy. Nor was plaintiff ever diagnosed with end-organ damage. None of plaintiff's treatment providers opined that plaintiff's erectile dysfunction was related to diabetes or that plaintiff's erectile dysfunction was indicative of end-organ damage. In fact, on November 18, 2009, Dr. Inampudi characterized plaintiff's diabetes as "better" (Tr. 496), and on April 2, 2010, diagnosed plaintiff with diabetes mellitus without complication. (Tr. 486-87).

Plaintiff also complains that the ALJ "did not mention" edema. (Docket No. 13 at 14). Contrary to plaintiff's statement, the ALJ did mention edema, acknowledging that it had been observed upon examination. (Tr. 12). Plaintiff also complains that the ALJ did not attempt to determine the cause of edema or the functional limitations it caused. However, the record contains no basis for the ALJ to make such an inquiry. No treatment provider listed edema as a diagnosis, as plaintiff suggests. Instead, edema was occasionally noted as a finding upon examination. When edema was

- 22 -

found on examination, it was not the focus of the examination nor was concern expressed that edema was an ominous finding that required special attention. No treatment provider attributed edema to any particular condition, or indicated that it limited plaintiff's ability to function. Plaintiff alleges no other deficiencies in the ALJ's RFC determination, and none appear after careful evaluation and consideration along with the administrative record.

B.  Dr. Inampudi's Opinion

The ALJ rejected Dr. Inampudi's opinion evidence after determining that it was inconsistent with other evidence in the record documenting that plaintiff's conditions were controllable with treatment. Plaintiff alleges error, arguing that the ALJ did not cite, and the record does not contain, support for the conclusion that plaintiff's impairments are well-controlled with treatment.

A treating physician's opinion is generally entitled to substantial weight, but it does not automatically control, because the ALJ must evaluate the record as a whole. Davidson v. Astrue, 501 F.3d 987, 990 (8th Cir. 2007) (citing Charles v. Barnhart, 375 F.3d 777, 783 (8th Cir. 2004)). According to the Regulations and to Eighth Circuit precedent, a treating physician's opinion must be well-supported by medically acceptable clinical and laboratory diagnostic techniques, and it must not be inconsistent with the other substantial evidence in the record. 20 C.F.R. §§ 404.1527(d), 416.927(d); Reed v. Barnhart, 399 F.3d 917, 920 (8th

- 23 -

Cir. 2005).  "If the opinion fails to meet these criteria, however, the ALJ need not accept it."  <u>Davidson v. Astrue</u>, 578 F.3d 838, 842 (8th Cir. 2009) (internal citation omitted); <u>see also Rogers v. Chater</u>, 118 F.3d 600, 602 (8th Cir. 1997); <u>Ward v. Heckler</u>, 786 F.2d 844, 846 (8th Cir. 1986) (If justified by substantial evidence in the record as a whole, the ALJ can discount a treating physician's opinion).  When an ALJ discounts a treating physician's opinion, he should give "good reasons" for doing so.  <u>Davidson</u>, 501 F.3d at 990 (citing <u>Dolph v. Barnhart</u>, 308 F.3d 876, 878 (8th Cir. 2002)).

Despite plaintiff's argument, the ALJ did cite support for the conclusion that plaintiff's conditions were controllable.  The ALJ's decision includes an exhaustive summary of the medical information of record, including documentation of the evidence demonstrating that plaintiff's conditions were controlled with medication and treatment.  (Tr. 14-16).  Later in his decision, the ALJ considered Dr. Inampudi's opinion, and wrote that it was inconsistent with the other medical information of record documenting that plaintiff's conditions were controllable with proper treatment and medications.  (Tr. 16).  As the ALJ noted, the January 2007 records from St. Mary's Health Center document that plaintiff had run out of medication and was suffering from symptoms, but that his symptoms resolved when treatment was administered.  The undersigned notes that the records specifically state:  "[d]uring the hospital stay [plaintiff] did not have any more symptoms.  His blood pressure was better when he received his

medication." (Tr. 356). Plaintiff presented to St. Joseph's Health Center in May of 2008 with complaints of chest pain, and it was noted that he was not taking his medication. (Tr. 284). Upon discharge, however, after undergoing treatment, plaintiff's blood pressure was under control and his condition was characterized as "improved and stable." (Tr. 275). When plaintiff visited the emergency room in January of 2010, it is noted that his symptoms resolved when he was given medication. (Tr. 450-51). As the ALJ observed, the administrative record documents numerous instances in which plaintiff presented for treatment of symptoms and it was observed that he had not taken his medications. (Tr. 274-75, 276, 278, 280, 284, 356, 431, 449).

As the ALJ observed, this evidence supports the conclusion that when plaintiff's conditions are uncontrolled, it is because of medication noncompliance (and, as will be discussed infra, sometimes cocaine use). While plaintiff asserts that the May 2008 St. Joseph's Health Center records document that he was compliant, review of those records show this statement to be inaccurate. During that visit, although plaintiff reported that had been compliant with medications, his statement was revealed to be untrue. Dr. Wasserstrom observed that plaintiff had not taken his medication that morning (Tr. 276), another doctor, Dr. Venkat, observed that plaintiff had not been taking blood pressure medicines (Tr. 278), and Dr. Wasserstrom ultimately opined that plaintiff had "probable medicine noncompliance." (Tr. 275).

This is not the only occasion on which plaintiff was

- 25 -

untruthful with a treatment provider: in November of 2008, plaintiff told Dr. Thoelke that he had not used cocaine and admitted cocaine use only after being confronted with a drug screen positive for cocaine. (Tr. 430-31).  In addition, while plaintiff told Dr. Park that he had been compliant with medications since being diagnosed with hypertension five to ten years ago (Tr. 389), review of the administrative record shows otherwise.   While plaintiff asserts that records from January 2009 document that his medicines were changed while he was incarcerated, what is actually documented is that plaintiff "[r]an out of his blood pressure medications because [he] was incarcerated and he was complaining of chest pain." (Tr. 356).  Regardless of the reason plaintiff was not taking medication as prescribed, the fact remains that the onset of his symptoms is most often caused by his failure to take medication.   The record contains other evidence of plaintiff's tendency to be noncompliant with medical advice.   In November of 2008, plaintiff left the hospital against medical advice, despite being warned that he might have heart disease and needed to undergo testing. (Tr. 432).  All of the foregoing evidence supports the ALJ's decision to discredit Dr. Inampudi's opinion evidence as inconsistent with the other evidence of record, as does the fact that Dr. Inampudi's opinion contains no indication of what medically acceptable clinical and laboratory diagnostic techniques were used. See 20 C.F.R. §§ 404.1527(d), 416.927(d); Davidson, 578 F.3d at 842 (citing Hacker, 459 F.3d at 937) (if an opinion is not well-supported by medically acceptable clinical and laboratory

diagnostic techniques and is inconsistent with the other medical evidence, and ALJ need not accept it).

Plaintiff next argues that the ALJ should have considered whether plaintiff missed doses of medication because he was unable to afford it.  Plaintiff contends that "substantial evidence supports the conclusion that Plaintiff was justified in not strictly following a prescribed course of treatment because he did not refuse treatment; he was denied medication secondary to an inability to pay." (Docket No. 13 at 12).

The Eighth Circuit has held that "a lack of sufficient financial resources to follow prescribed treatment to remedy a disabling impairment may be ... an independent basis for finding justifiable cause for noncompliance [with prescribed treatment]." Tome v. Schweiker, 724 F.2d 711, 714 (8th Cir. 1984).  However, this administrative record wholly fails to support the conclusion that plaintiff's noncompliance was justified.  There is no evidence that plaintiff ever sought medication and was refused due to an inability to pay.  Instead, the record shows that plaintiff sought medical treatment fairly regularly, including visiting the emergency room and visiting Grace Hill Clinic.  On one occasion, plaintiff left Barnes Jewish Hospital against medical advice because he chose to attend to a family matter, not because he could not afford care. (Tr. 432).  In addition, for at least part of the relevant time period, plaintiff apparently had sufficient resources to obtain cocaine and cigarettes.  Such evidence is consistent with the conclusion that plaintiff did not take his medication because

he did not want to, or because he did not think his conditions caused symptoms that were severe enough to require medication. The evidence of record is wholly inconsistent with plaintiff's claim that he did not take his medications because he could not afford them. See Brown v. Barnhart, 390 F.3d 535, 540 (8th Cir. 2004).

Plaintiff suggests that the fact that Dr. Inampudi prescribed injectable insulin supports Dr. Inampudi's opinion that plaintiff's diabetes was not controllable with medication. However, if Dr. Inampudi believed that plaintiff's diabetes could not be controlled with medication, then it is unlikely that he would have prescribed medication. Dr. Inampudi never recommended that plaintiff needed to be hospitalized for elevated blood sugar, he never referred plaintiff for treatment more intensive than that offered at Grace Hill Clinic, and he never suggested that diabetes was causing complications necessitating a more aggressive form of treatment. Also notable is the fact that Dr. Inampudi prescribed injectable insulin during the same visit he observed that plaintiff was not compliant with the recommended diabetic diet.

Dr. Inampudi's opinion evidence is also inconsistent with his own treatment records. During plaintiff's course of treatment, Dr. Inampudi characterized plaintiff's diabetes and hypertension as "better" (Tr. 496) and characterized his diabetes as having no mention of complication. (Tr. 487). Dr. Inampudi repeatedly documented that review of systems was negative (Tr. 486, 499-500), and he advised plaintiff to continue on his current medication regimen. (Tr. 499-500). Dr. Inampudi wrote that he discussed

compliance with plaintiff (Tr. 496), and noted that plaintiff was not complying with dietary restrictions.  (Tr. 486).  Despite his opinion evidence describing plaintiff's diabetes and hypertension as uncontrolled, Dr. Inampudi's treatment records fail to document serious concerns about controlling either condition, or that he ever sent plaintiff to the hospital.  A treating physician's opinion must be consistent with his own treatment records in order to be entitled to significant weight.  See Davidson, 578 F.3d at 842 ("It is permissible for an ALJ to discount an opinion of a treating physician that is inconsistent with the physician's clinical treatment notes").

Finally, Dr. Inampudi's statement that plaintiff could not do any work is not the type of opinion the Commissioner is required to consider.  A medical source's opinion that a claimant is "disabled" or "unable to work" involves an issue reserved for the Commissioner, and is therefore not the type of medical opinion to which the Commissioner gives controlling weight.  See Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004) ("[T]reating physicians' opinions are not medical opinions that should be credited when they simply state that a claimant can not be gainfully employed, because they are merely opinions on the application of the statute, a task assigned solely to the discretion of the Commissioner"); 20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1).  The ALJ properly considered and weighed Dr.

Inampudi's opinion.[9]

C.   Medication Side Effects

Noting that the ALJ's decision confirmed the duty to consider medication side effects when assessing credibility, plaintiff contends that the ALJ failed to properly consider his testimony that his medications made him drowsy and that he had low energy.   In support, plaintiff argues that, "[a]ccording to Drugs.com, a common side effect of three (3) of Plaintiff's medications, metoprolol, lisinopril and trazodone, is drowsiness. This supports Plaintiff's contention that his medication makes him tired, requiring a daily nap."  (Docket No. 13 at 12).

An ALJ is required to consider medication side effects (among other factors) when assessing credibility.  Polaski v. Heckler, 739 F.2d 1320, 1321-22 (8th Cir. 1984).   In the case at bar, the ALJ expressly acknowledged his duty to consider the "type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate pain or other symptoms." (Tr. 14).  The ALJ then acknowledged plaintiff's allegation that he took a three-hour nap daily because his medications made him

---

[9]Plaintiff's brief includes recitation of Eighth Circuit case law on the subjects of an ALJ's duty to fully and fairly develop the record and to re-contact a treating physician when necessary.   To the extent plaintiff can be understood to attempt to develop arguments based upon these areas of the law, the undersigned has reviewed the ALJ's decision in light of the administrative record and concludes that the ALJ fulfilled his duty to ensure a fully and fairly developed record, and was under no obligation to re-contact any of plaintiff's treatment providers.

sleepy, but concluded that this testimony was not supported by the medical record. (Id.) This finding is supported by the record. Plaintiff does not allege, and review of the record does not reveal, evidence that plaintiff mentioned to his treatment providers that his medications caused drowsiness or sleepiness, or that he required a three-hour daily nap. Accordingly, the ALJ was under no obligation to consider such side effects in his RFC determination. See Ownbey v. Shalala, 5 F.3d 342, 345 (8th Cir. 1993) (ALJ did not err in discrediting claimant's testimony that her medication caused dizziness and drowsiness where the record contained no complaints of side effects to her physicians); Wildman v. Astrue, 596 F.3d 959, 968 (8th Cir. 2010) (inconsistencies in the record are proper considerations in assessing credibility).

While plaintiff cites information available on Drugs.com as supportive of his testimony that his medications caused drowsiness and that he required a three-hour daily nap, Drugs.com contains no information specific to plaintiff. While Drugs.com may indeed indicate that drowsiness is a common side effect, such an indication cannot be extended to support the conclusion that every person who takes those medications will suffer from drowsiness and/or require a three-hour daily nap. Finally, there is no evidence supporting the conclusion that plaintiff's alleged side effects existed for a period of twelve consecutive months. 20 C.F.R. §§ 404.1509, 414.909; Shell v. Astrue, 4:11CV1201 MLM, 2012 WL 2191282, at *7 (E.D. Mo. May 15, 2012) (citing 20 CFR § 414.909)

- 31 -

(medication side effects must be expected to last for a continuous period of at least 12 months to be considered disabling).

Plaintiff alleges no other error in the ALJ's credibility assessment.  Even so, the undersigned has fully analyzed the ALJ's credibility determination, and concludes that it is supported by substantial evidence on the record as a whole.  In his decision, the ALJ wrote that he had considered all symptoms and the extent to which they could reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 C.F.R. §§ 404.1529 and 416.929, and SSRs 96-4p and 96-7p.  (Tr. 13).  The ALJ then included a narrative description of his obligations in considering plaintiff's subjective allegations, and listed all of the relevant factors he was required to consider.  (Tr. 13-14).  The ALJ then noted several inconsistencies in the record that detracted from the credibility of plaintiff's subjective complaints.  Having reviewed the ALJ's credibility determination in light of the evidence of record, the undersigned concludes that the ALJ's adverse credibility assessment is supported by substantial evidence on the record as a whole.

D.   Plaintiff's Cocaine Use

Among those impairments the ALJ determined were severe was "cocaine-induced cardiomyopathy[10] and chest pain."  (Tr. 11,

---

[10]As the defendant correctly points out, the record contains no diagnosis of cardiomyopathy, but it does document cardiomegaly.  Cardiomyopathy is a disease that weakens and enlarges the heart muscle.  Cardiomyopathy makes it harder to

14).  Plaintiff contends that the ALJ erroneously failed to obtain
a medical expert to determine whether illegal drugs caused or
contributed to plaintiff's heart disease and the degree of
limitation caused thereby.  Plaintiff argues that the ALJ failed to
consider "medical records that found cardiomyopathy and chest pain
with no mention of cocaine use" and later states that the ALJ
"cited no medical evidence to prove Plaintiff's chest pain and
cardiomegaly[11] were caused by cocaine use."  (Docket No. 13 at 15)
(footnote added).

       Plaintiff's contention that the ALJ "cited no medical
evidence" regarding cocaine use causing/contributing to plaintiff's
cardiac condition and chest pain is wholly without merit.  In his
decision, the ALJ cited medical evidence supporting the conclusion
that plaintiff's cardiac problems were caused or exacerbated by his
cocaine use.  (Tr. 14-15).  As the ALJ observed, on November 17,
2007, chest x-ray showed cardiomegaly and mild pulmonary vascular

---

pump blood and deliver it to the rest of the body.  There are
many causes of cardiomyopathy, including coronary artery disease
and valvular heart disease. Cardiomyopathy can lead to heart
failure. See
http://www.mayoclinic.com/health/cardiomyopathy/DS00519.
Cardiomegaly, also known as "enlarged heart," is not a disease,
but rather a symptom of another condition.  See
http://www.mayoclinic.com/health/enlarged-heart/ds01129.   It is
most likely that the ALJ's use of the word "cardiomyopathy" was a
typographical error.  In his recitation of the medical evidence
of record, the ALJ correctly summarized plaintiff's diagnosis of
cardiomegaly.  (Tr. 14).

       [11]Plaintiff also appears to confuse the terms
"cardiomyopathy" and "cardiomegaly"

congestion that was thought to have been induced by plaintiff's cocaine use, and he was instructed to stop using drugs. (Tr. 245). On November 6, 2008, plaintiff was diagnosed with chest pain and hypertensive urgency "likely exacerbated by the cocaine use," which was identified via a drug screen, and plaintiff was again told to stop using cocaine. (Tr. 428-29). The ALJ also noted the May 2008 records from St. Joseph's Health Center documenting that the cardiac symptoms plaintiff experienced stemmed from an uncontrolled hypertension episode in which plaintiff was not taking his medications. (Tr. 15). As the ALJ concluded, this evidence supports the conclusion that, absent plaintiff's drug use and medication noncompliance, his cardiac condition would not cause significant work-related restrictions.

For all of the foregoing reasons, on the claims that plaintiff raises, the undersigned determines that the Commissioner's decision is supported by substantial evidence on the record as a whole, and should therefore be affirmed. Because there is substantial evidence to support the decision, reversal is not required merely because substantial evidence may support a different outcome, or because another court could have decided the case differently. Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir.2001); Browning, 958 F.2d at 821.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is affirmed, and plaintiff's Complaint is dismissed with prejudice.


Frederick R. Buckles
UNITED STATES MAGISTRATE JUDGE

Dated this 27th day of September, 2013.